DETERMINED IN

# THE SUPREME COURT

OF THE

# STATE OF WYOMING

APRIL TERM, 1905.

## DELANEY v. STATE.

CRIMINAL LAW—ASSAULT AND BATTERY WITH INTENT TO COMMIT MURDER—SELF-DEFENSE—ASSAULT BY ONE IN HIS OWN HOUSE—INSTRUCTIONS—INSTRUCTIONS AS TO LOWER OFFENSES—DUTY OF DEFENDANT TO REQUEST—FAILURE OF COURT TO INSTRUCT AS TO LOWER OFFENSES—APPEAL AND ERROR.

1. Where a defendant charged with assault and battery with intent to commit murder attempts to justify his acts on the ground of self-defense, the attitude of the person assaulted at the time of the assault is a question of fact for the jury.

2. In a prosecution for assault and battery with intent to commit murder, it appearing from the evidence that the person assaulted being lawfully in defendant's house was ordered by the latter to leave upon the occurrence of a disagreement between them, an instruction that "if defendant procured his gun while the person assaulted was fleeing from the house, and went to the door and immediately shot at him with intent to kill him, the jury should find the defendant guilty was proper; since the instruction left the jury to determine whether the person assaulted was endeavoring to get off defendant's place as he was ordered to do, and to escape grievous bodily injury at the hands of defendant.

3. If the person assaulted under such circumstances was fleeing and endeavoring to escape the injury at the time he was shot, then there would be no justification for the shooting.

4. One who commits an assault in his own house upon another lawfully therein, or while the latter is peacefully leaving the house in obedience to his directions, does not stand in a different position, in law, than if he had committed the assault in the open, or upon the public highway.

5. As applied to the law of self-defense, there is a difference between the words "retired" and "retreated"; the latter implies an act under pressure or force, a driving back, while the former may, and usually does, rest solely in volition.

6. Where the defendant charged with assault and battery with intent to commit murder is the aggressor, though in his own house, he is in the attitude of one who assaults another on the highway, and upon whom the law imposes the duty of withdrawing in good faith from, and not for the purpose of renewing, the assault, before he can justify shooting his adversary on the ground of self-defense.

7. Where the defendant charged with assault and battery with intent to commit murder was shown by the evidence to have committed the assault by firing one shot from the door of his house at a fleeing party, who had been ordered from the house after having lawfully entered it, and then retired to a less exposed place, from which he fired other shots; and where the court at defendant's request instructed the jury that one assaulted in his own house under such circumstances as to induce belief that he is in danger of losing his life or suffering great bodily harm, he is not obliged to retreat, but may pursue his adversary until he has freed himself from danger; *Held,* that an instruction at the request of the prosecution was not prejudicial stating that if the jury should find from the evidence that the defendant could have retired to a place of safety before the fleeing party reached his gun, then it was his duty to have done so, and the shooting was not justified by a belief that the fleeing party was going after his gun, and that to justify the use of a deadly weapon by one assaulted the circumstances must appear to be such that there is no other reasonable means of escape from death or great bodily harm. The use of the word "escape" in the instruction, though improper, was not prejudicial.

8. It is the duty of a defendant in a criminal prosecution desiring an instruction as to the right of the jury to acquit of the higher and convict of the lower offenses included in the charge to prepare and present a proper instruction thereon; and where an erroneous instruction on the subject was properly refused, defendant cannot complain on error of the failure of the court to give a proper instruction, where none was requested, where such failure to so instruct was neither excepted to, made a ground for new trial, nor assigned as error.

9. In a prosecution for assault and battery with intent to commit murder, an instruction requested by the defendant was properly refused as misleading and erroneous, which stated that if the jury should find from the evidence beyond a reasonable doubt that the defendant unlawfully and maliciously inflicted grievous bodily harm upon the person charged to have been assaulted, or unlawfully or maliciously wounded him, then their verdict might be guilty of aggravated assault and battery, and, in a similar manner, permitted a verdict of guilty of the other lower offenses respectively if the necessary facts to constitute the same were found from the evidence, ignoring in each instance the right of the jury to find, in addition to such facts, whether the intent to kill accompanied the assault and battery, as charged in the information, and, in effect, eliminating in respect to each lower offense, the right of the jury to find the facts necessary to constitute a higher offense included in the charge.

[Decided August 1, 1905.]                    (81 Pac., 792.)

ERROR to the District Court, Uinta County, HON. DAVID H. CRAIG, Judge.

William J. Delaney was charged upon an information filed by the Prosecuting Attorney of Uinta County with the crime of assault and battery upon one Stark with intent to commit murder. He was found guilty as charged in the information, was sentenced to imprisonment in the penitentiary, and thereupon prosecuted error.

*J. H. Ryckman,* for plaintiff in error.

The trial court erred in refusing to instruct the jury that the defendant might be found guilty of aggravated as-

sault and battery or of assault and battery. Whether the defendant was guilty or not, and if guilty, the degree of the offense, was for the jury. (Rev. Stat. 1899, Sec. 5389; Brantley v. State, 9 Wyo., 102; State v. Fisher, 3 N. E., 379; 2 Pl. & Pr., 857; State v. Cooper, 3 Pac., 429.) Aggravated assault and battery as defined by Section 4959, Revised Statutes, is .included in assault and battery with intent to kill, and the same is true of assault and battery as defined by Section 4658, and there being evidence that would have justified the jury, under proper instruction, in returning a verdict under either of those sections, the court should have instructed them as to their duty in that regard. Such an instruction ought to be given even where the evidence of the inferior offense is slight; and where there is no evidence of a lower degree, except that of the defendant, the question as to the lower degree should be submitted to the jury. (Bish. Crim. Proc., 3980; State v. Evans, 36 Kan., 497; 11 Pl. & Pr., 212, 215; State v. Palmer, 88 Mo., 568; State v. Dolan, 17 Wash., 499; State v. Young, 60 Pac., 650; People v. Watson, 57 Pac., 1071 (Cal.); State v. Young, 99 Mo., 666; Dolan v. State, 44 Neb., 643; Carleton v. State, 61 N. W., 699; State v. Clemmons, 51 Ia., 274; State v. Walters, 45 Ia., 389; State v. Pannell, 56 Ia., 29; State v. Peters, 56 Ia., 263; Chappel v. State, 7 Caldw., 92 (Tenn.)

Where instructions are inconsistent, the judgment must be reversed. (Palmer v. State, 9 Wyo., 40.) And erroneous instructions are not cured by the fact that the law on the subject is correctly stated in another. (Yerkes v. R. R. Co., 112 Wis., 184.) Instructions 8, 9 and 10 were erroneous and prejudicial to the rights of the defendant. Instruction number 8 seems to make the procuring of a gun by the defendant evidence of his guilt; yet he might have been justified, since there is no evidence that he shot at Stark at any time before the latter got his gun and pointed it at the defendant's house. The ninth instruction stated that if defendant could have retreated to a place of

safety before plaintiff reached his gun, it was his duty to have done so. That is not the law governing the conduct of a man on his own premises. (Palmer v. State, *supra;* Elder v. State, 69 Ark., 648.) Again these instructions took away from the jury matters which are exclusively in their province.

*W. E. Mullen,* Attorney General, for the State.

The allegations of the information would not support either assault and battery or aggravated assault and battery as those crimes are defined in the statute; and the question arises, therefore, whether if the defendant had been convicted of a felonious intent as charged there would sufficient remain to charge the lower offenses. The statute in defining assault, assault and battery, and aggravated assault and battery has departed from the definitions at common law. If the allegation of the information will not support the lesser offenses, then there was no error in refusing to give the instructions requested by the plaintiff in error. Further the evidence does not make out a case of assault and battery or aggravated assault and battery; the wounds inflicted were sufficient to produce death ordinarily, and the evidence does not disclose the slightest justification for the assault and battery by plaintiff in error. Applied to the evidence, the instructions given to the jury which are complained of by counsel for plaintiff in error are not prejudicial, but correctly state the law as governed by the evidence; but if there was any error in the ninth instruction, it was not prejudicial. Upon the whole case the verdict and judgment was clearly right and a reversal would not be authorized. (Miller v. State, 3 Wyo., 663.)

Scott, District Judge.

The defendant (plaintiff in error) was tried upon an information charging him with an assault and battery with intent to commit murder, found guilty and sentenced to the penitentiary for a term of years.

1. Plaintiff in error contends that it was error for the court to give to the jury the following instructions which were requested by the State, viz:

"8. If you find from the evidence that the defendant procured his gun while Stark was fleeing from the house, and went to the door and immediately shot at Stark with intent to kill him, then you should find the defendant guilty.

"9. If you find from the evidence that the defendant could have retired to a place of safety before Stark reached his gun, then it was his duty to have done so, and he was not justified in shooting Stark because he may have believed that Stark was going after his gun. To justify the use of a deadly weapon by the defendant when an assault has been made upon him, the circumstances must appear to be such that there is no other reasonable means of escape from death or great bodily harm."

As to whether these instructions or either of them are erroneous in whole or in part, or if erroneous as applied to the facts in this case was prejudicial to him, requires a review of the evidence and may be considered together.

Defendant was a ranchman engaged in raising sheep, his ranch being situated near the mouth of La Barge Creek on Green River, Uinta County, Wyoming. On the morning of November 24th, 1904, he, together with his hired men, were building a corral close to the dwelling house on the ranch. This house was constructed substantially of logs, having but three rooms, and was used by the defendant and his employes. There was a small door yard with a gate just in front of the house. While they were so engaged, one Stark rode up on horseback with his rifle across the front of his saddle, passed the time of day with defendant, dismounted, hitched his horse to the wheel of the buckboard which stood about thirty yards from and in front of the house, and leaned his rifle against the buckboard on the opposite side from the house. Some pleasantries passed between the parties, and Stark asked defendant if there was any mail for him, and the latter answered saying there was

a letter for him in the house. Thereupon Stark went into the house. Stark had previously worked for defendant for short periods of time and had left sóme things there when he quit work the last time. His principal occupation was trapping and hunting wolves and coyotes for the bounty on them, and he carried his rifle with him for that purpose. There had been some disagreement between him and defendant, but not of a serious nature, and no evidence was introduced upon the trial to show that he was a quarrelsome or dangerous man, or had made any threats against the life of or to do the defendant any bodily harm. There was an unsettled account between him and defendant with reference to a wagon cover.

Stark, failing to find his letter, came to the door and inquired where the letter was, and defendant told him it was on the window, and, upon this information, procured and sat down to read it, and was reading when defendant entered the house and said he would get his check book and write him out a check for the three dollars he owed him for the wagon cover. Stark refused to take the check, owing, as he said, to the remote place they were in and the difficulty in cashing it, and said, "I don't want your check," whereupon defendant flew into a passion, saying if his check was not good, then he himself was no good, and ordered Stark to get his things and get off the place. Stark went into an adjoining room to pack up his things, and defendant went out to the men to see if he could get the cash, using to them vile and profane language with reference to Stark, saying he had told him to pack up his things and get out of there, and came back to the house, two of the men following him there. These two men were witnesses as to what occurred in the house from that time on, and their evidence practically agrees with that of Stark and the defendant. Stark came out of the side room with his things done up in a bundle, including a violin which the defendant ordered him to leave, and grabbed him and attempted to take it away from him, harsh and vile epithets being applied one to the other.

Stark jerked the bundle away and, freeing himself, started out the door on a run to the buckboard, where his horse and rifle were. Defendant rushed into an adjoining room, procured his loaded rifle and came to the door looking for Stark, the latter at that time having dropped his bundle in his flight and being crouched behind the front wheel of the buckboard for shelter. Defendant immediately raised his rifle and, aiming at Stark, fired, the bullet passing through the spoke of the wheel, entering Stark's right hip and passing through the fleshy part from right to left. Stark arose with his gun and, walking sideways and backward facing the house, his rifle not raised or aimed, but with the muzzle in the direction of the house, endeavored to get in the rear of a shed near by, and while doing so mistook witness Hamp, who had left the house to get out of the possible range of any shots that Stark might return, for the defendant, and fired at·him without inflicting any injury. The defendant, after the first shot, retired from his doorway to a less exposed place and fired the succeeding shots through a window while Stark was endeavoring to gain the shelter of the shed, one of the bullets striking Stark at the inner part of the left eye, ranging downward and passing out of the right side of the neck.

Stark, still going away or trying to get away, was about to be fired at again by defendant, who was dissuaded from doing so by witness Hamp, who informed him that he had already killed him. He fell and was cared for by the men about the place and taken to a ranch about four miles distant, defendant not assisting, but expressing the deepest feeling of malice and hatred when asked what should be done with Stark. A physician and surgeon was summoned, who reached Stark forty-eight hours after the shooting occurred, and who had him under surgical and medical treatment for four months. There is some conflict as to the number of shots fired by defendant, but that question is immaterial. There were certainly a sufficient number. The physician who attended Stark testified that there were eight

bullet holes, counting the various points of entrance and exit, any one of which was likely to produce death. Aside from this, there is no conflict in the evidence as to these facts. Defendant sought to justify the shooting on the ground of self-defense, and testified that when he fired the first and second shots Stark had his rifle pointed at him. In this connection we quote from the testimony of his own witness, Danvers, upon direct examination:

Q. The first thing that attracted your attention in connection with this difficulty was loud voices.

A. Yes, men apparently quarreling.

Q. And then you saw Stark coming from the house. Did you see what he carried, if anything?

A. A bundle with a blanket around it, tied up with a rope.

Q. Was he in your full view then from the time he left the front door of the house until the first shot was fired?

A. From the time he left the front gate he was. I couldn't hardly see the door.

Q. What did he do? Describe his movements.

A. He was running and he threw his bundle right upon or near the buckboard tongue, and I noticed him grab a-hold of the buckboard tongue and swing behind it.

Q. Around the front of the buckboard?

A. Yes, sir.

Q. What did he do next?

A. He stood there for a fraction of a second, looked back toward the house, crouched behind the buckboard and reached over and grabbed his rifle and drew it toward him. It was right by the buckboard and he drew it close to him.

Q. And at this time there had been no shot fired?

A. No, the shot was fired next.

Q. What was the next thing you heard?

A. I heard a shot.

With this evidence before the jury, they were instructed fully upon the law of self-defense. By instruction 8 the tentative fact was left to the jury to determine whether or

not Stark was endeavoring to get off the place with his be-
longings as he was ordered to do and to escape grievous
bodily injury at the hands of the defendant. If he was
thus fleeing and endeavoring to escape such injury at the
time he was shot, then there was no justification for shoot-
ing. His attitude at the time the shots were fired was one
of fact and properly left to the jury under this instruction.

It will be seen from the evidence that Stark was in the
house by leave and license, and when the dispute arose he
proceeded to carry out the order given him by the defendant,
an order which the latter had a right to give and enforce in
a proper manner, if resisted, whether founded in reason or
as the result of caprice. That he packed up his belongings
and was proceeding to leave the place in a quiet and orderly
manner when he was assaulted by the defendant, not for the
purpose of ejecting him from the house, which was unneces-
sary, but to take from his possession the violin which the
defendant demanded that he leave at the house. This as-
sault was fierce, intense and relentless, and only ended when
Stark near the shed was staggering and about to fall from
the effect of his wounds, and defendant was dissuaded from
firing at him again upon being informed that he had already
killed him.

The court instructed the jury as to the right of one to
defend himself in his house against one who assaults him
therein, but the undisputed evidence is that Delaney was
not assaulted; he was the aggressor. He committed an
assault and battery upon Stark and the latter, jerking him-
self loose, fled from the house. This case is clearly dis-
tinguishable from Palmer v. State, 9 Wyo., 40. In that case
"it was uncontradicted * * * that the deceased, after
assaulting the defendant and threatening his life, pursued
him, invaded his house and assaulted him there with the
avowed purpose of killing him." This court further says:
"The person so assaulted has the right to defend himself
and to pursue his adversary until he has freed himself from
danger." It will be observed that the right to pursue ac-

crues to the party assaulted under similar circumstances. It is as much the duty under the law for one not to commit an assault in his own house as it is anywhere else. It is not his duty to retreat if assaulted therein, but he may stand his ground and defend against such an assault. If, however, he commits an assault upon one lawfully therein, or upon one who is peaceably leaving the house in obedience to his directions, it is difficult to see how in law he stands in any different light than as though he had committed the assault in the open or upon the public highway. It will be observed that Stark was unarmed when he entered the house and that the trouble therein did not involve any violence, or attempted or intended violence, to the dwelling or property or family of the defendant. The trouble was wholly personal. The rules of law governing one's conduct when assaulted in his house are for his protection and to secure the safety and peace of himself, his house and home from violators of the law, and not to shield him as a violator. If he, as did the defendant, commit an assault under such circumstances, in a place of his own choosing, then it is a misstatement of the law to say that because it is in his house he shall not suspend such unlawful act and avoid unnecessary infliction of grievous bodily harm upon the one so assaulted. We think this view of the law is clearly supported in State v. Martin, 30 Wis., 216; State v. Partlow, 90 Mo., 608; State v. McIntosh, 40 S. C., 349.

In the ninth instruction the word "retired" is used and defendant claims that this is equivalent to the word "retreated," and that he was thereby prejudiced. We think as applied to the law of self-defense there is a difference in meaning of the two words: the latter always implies an act under pressure or force, a driving back, while the former may and usually does rest solely in volition. The use of the word "escape" in the second part of the instruction was not proper, but, in view of the evidence in this case that the defendant did after firing the first shot retire to a less exposed place, we do not think this instruction misleading or

prejudicial, especially when considered in connection with, and that its meaning was restricted to a voluntary withdrawal from the assault by, the instruction which was given at the request of the defendant that where one is assaulted in his own house under such circumstances as to induce the belief that he is in danger of losing his life or suffering great bodily harm he is not obliged to retreat, but may pursue his adversary until he has freed himself from danger, an instruction which in connection with the other instructions as a whole embodied the law of the case. If there was any evidence that Stark while in the house assaulted Delaney, we would not hesitate to hold it prejudicial error to have given the instruction complained of. Having been the aggressor, the defendant placed himself in the attitude of one who assaults another on the highway and upon whom the law imposes the duty of withdrawing in good faith from and not for the purpose of renewing the assault before he can justify shooting his adversary on the ground of self-defense.

2. The defendant assigns as error the refusal of the court upon his request to give the following instruction:

"Under this information you may find the defendant guilty of an assault and battery upon the prosecuting witness, C. L. Stark, with intent to kill and murder;

"Or you may find the defendant guilty of unlawfully inflicting upon the said C. L. Stark grievous bodily harm;

"Or you may find the defendant guilty of assault and battery;

"Or you may find the defendant guilty of unlawfully attempting to commit a violent injury upon the said C. L. Stark;

"Or you may find the defendant not guilty.

"If you find from the evidence beyond a reasonable doubt that the defendant perpetrated an assault and battery upon the said C. L. Stark with intent to kill and murder him, the said C. L. Stark, your verdict may be in the following form:

" 'We, the jury, find the defendant guilty of assault and

battery with intent to kill C. L. Stark as charged in the information,' and signed by your foreman.

"If you find from the evidence beyond a reasonable doubt that the defendant unlawfully and maliciously inflicted grievous bodily harm upon the said C. L. Stark, or unlawfully or maliciously wounded the said C. L. Stark, then your verdict may be in the following form:

" 'We, the jury, find the defendant guilty of aggravated assault and battery as charged in the information,' and signed by your foreman.

"If you find from the evidence beyond a reaosnable doubt that the defendant in a rude, insolent or angry manner unlawfully injured the said C. L. Stark, your verdict may be in the following form:

" 'We, the jury, find the defendant guilty of assault and battery as charged in the information,' and signed. by your foreman.

"If you find from the evidence beyond a reasonable doubt that the defendant, having the present ability to do so, unlawfully attempted to commit a violent injury upon the person of said C. L. Stark, then your verdict may be in the following form:

" 'We, the jury, find the defendant guilty of attempting to commit a violent injury upon the person of C. L. Stark,' and signed by your foreman."

This instruction as a whole upon its face is misleading, erroneous and does not state the law. The law is not, on the trial of one charged with the crime of an assault and battery perpetrated with a felonious intent, that upon admission or proof of the assault and battery the jury may not consider the motive or intent with which it is perpetrated. This instruction, which was the only one asked or requested on this branch of the case, does not inform the jury that if they find from the evidence beyond a reasonable doubt that the assault and battery as defined was committed by the defendant, and if they have or entertain a reasonable doubt as to whether it was committed with the intent to

kill, then they should acquit the defendant of the higher
and find him guilty of the lesser offense. In effect, the in-
struction eliminates that question and takes it from the jury.
If the defendant desired the court to instruct the jury as to
the lower offenses included in the charge, it was his duty
to prepare and present a proper instruction thereon.

It was suggested in argument that it was the duty of
the court to so instruct without being requested, but we
need not decide that question, for no exception was taken
to the failure of the court to so instruct, nor was it made a
ground for a new trial nor assigned as error. (State v.
Brantley, 9 Wyo., 102.)

No prejudicial error appearing in the record, the judg-
ment will be affirmed.                          *Affirmed.*

POTTER, C. J., and PARMELEE, District Judge, concur.

Justices Beard and Van Orsdel being disqualified, Dis-
trict Judges Scott and Parmelee were called in to sit in
their stead.